UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CONNIE J. ORTON-BELL,           )<br>                                                       )<br>                      Plaintiff,         )<br>                                                       )<br>              vs.                               )     Cause No. 1:11-cv-805-WTL-TAB<br>                                                       )<br>STATE OF INDIANA,                  )<br>                                                       )<br>                      Defendant.    )   | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment of the Defendant, the State of Indiana (dkt. no. 31). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below. In light of this ruling, the Court also **DENIES AS MOOT** the Defendant's motion to strike sections of the Plaintiff's Sur-reply (dkt. no. 56).

### I.     PRELIMINARY MATTERS

In response to the designation of evidence filed by the State of Indiana (the "State") in support of its motion for summary judgment, Plaintiff Connie Orton-Bell objects to several affidavits submitted by the State.[1] Specifically, Orton-Bell objects to the affidavits of Patricia Guffey, Ralph Hannon, Steve Hodge, Richard Fleming, and Ashley Hungate on the grounds that the affiants were not disclosed as witnesses in the State's initial disclosures or the State's preliminary witness list and were not identified as witnesses prior to the deadline for the close of discovery.

---

[1] The Court appreciates the Plaintiff's proper use of Local Rule 56-1(i).

The State filed its motion for summary judgment and the supporting affidavits of Guffey, Hannon, Hodge, Fleming, and Hungate on July 31, 2012. At that time, the close of discovery was scheduled for August 2, 2012. Although more time would have been convenient and undoubtedly appreciated, the State did, in fact, effectively disclose each of the five affiants prior to the close of discovery. Additionally, on August 7, 2012, the State filed a motion to extend the discovery deadline for the purposes of deposing Orton-Bell. The motion was granted on August 17, 2012, and the deadline for deposing Orton-Bell was extended to September 12, 2012. Had Orton-Bell wished to depose the five affiants prior to responding to the State's motion for summary judgment, which she did almost three months after the affiants were disclosed on October 26, 2012, she could have likewise moved for time to do so pursuant to Federal Rule of Civil Procedure 56(d)(2).[2] She chose not to do so.

For these reasons, the Court finds that the State's disclosure of Guffey, Hannon, Hodge, Fleming, and Hungate two days before the scheduled deadline for the close of discovery was timely, and in any event, Orton-Bell was not prejudiced by the disclosure. Accordingly, Orton-Bell's objections regarding the belated disclosure of Guffey, Hannon, Hodge, Fleming, and Hungate are overruled.

Additionally, the State makes several objections regarding the evidence submitted by Orton-Bell in opposition to the State's motion for summary judgment. The State objects to various portions of the affidavits of Treddia Couch and Diane Ripberger on the ground that they contain "an amalgam of hearsay, speculation, and irrelevant information." The State further

---

[2]Federal Rule of Civil Procedure 56(d)(2) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery."

2

objects to several newspaper articles designated by Orton-Bell regarding workplace romances on the ground that such information is "irrelevant hearsay."

The Court has reviewed the particular affidavits and newspaper articles in question. The affidavits and the newspaper articles do not contain evidence relevant to the Court's analysis of Orton-Bell's specific claims against the State. Because the evidence does not assist Orton-Bell with establishing the elements necessary to defeat the State's motion for summary judgment, the Court need not, and does not, resolve the State's objections to it.

## II.   STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true all admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

### III. BACKGROUND

The relevant facts of record, viewed in the light most favorable to Orton-Bell, the non-moving party, are as follow.

In April 2008, Orton-Bell was hired by the State to serve as a Substance Abuse Counselor 3 at the Pendleton Correctional Facility ("PCF") in Pendleton, Indiana. Orton-Bell remained in that position until her employment was terminated by the State on March 7, 2010.

It is apparent that Orton-Bell had several embarrassing and uncomfortable experiences while working at PCF.[3] For example, on one occasion, while passing through the shakedown area at PCF, a female correctional officer required Orton-Bell to remove her sweater so that the sweater could be passed through a scanner.[4] As a result, Orton-Bell's spaghetti-strap camisole tank top was exposed to male employees and offenders in the shakedown area. Orton-Bell complained about the incident to the Assistant Superintendent at PCF, and the Assistant Superintendent instructed the officers in the shakedown area that, in the future, Orton-Bell was not required to remove her sweater.

Additionally, on various occasions, male employees at PCF made sexual comments to Orton-Bell when she received pat-downs from female correctional officers in the shakedown area. Orton-Bell also experienced excessive pat-downs in front of the male employees at PCF from female officers on several occasions. According to Orton-Bell, the male employees at PCF stated that watching a female correctional officer give the pat-down to Orton-Bell "was almost like sex for them." The male employees also called Orton-Bell names such as "Princess" and

---

[3] It is not entirely clear from the evidence exactly when the events detailed below occurred. As a result, the events may not be discussed in chronological order.

[4] In the shakedown area, employees and visitors at PCF must remove their jackets and shoes so that each can be passed through a scanner, they must pass through a metal detector, and they must undergo a pat-down search.

"Cinderella" and occasionally engaged in sexual banter with Orton-Bell in person and via email. Orton-Bell, however, also engaged in sexual banter with her co-workers. Furthermore, Orton-Bell was not permitted to wear jeans to work even though male employees were allowed to do so. Orton-Bell complained about these events and issues to several superiors at PCF, but did not make any reports to the State pursuant to the State's policy regarding sexual harassment.

At some point during Orton-Bell's employment at PCF, Orton-Bell suggested to her superiors that PCF should develop an outside dormitory therapeutic community. The State has an Employee Suggestion Program that provides for the recognition of employees who make valuable suggestions, which, at times, may include a monetary award. Orton-Bell's Superintendent, however, told her that she should not submit an application for the award and that if she tried to claim ownership of the idea "she would very quickly lose [her] position with the State." Therefore, Orton-Bell did not submit her suggestion to the State pursuant to the Employee Suggestion Program guidelines. Thereafter, PCF created the outside dormitory therapeutic community. Orton-Bell was not recognized in relation to the outside dormitory therapeutic community and was not given a monetary award for her contributions. Rather, PCF engaged Richard Fleming to oversee development of the program. Fleming had created a similar therapeutic community at the Correctional Industrial Facility ("CIF") within the Pendleton Correctional Complex.[5] Additionally, while Fleming was at PCF, he was in a superior position to Orton-Bell and thus, oversaw Orton-Bell and her staff. During that time, Orton-Bell's supervisory duties over one or two staff members at PCF were reduced. Orton-Bell complained about these issues to several superiors at PCF.

---

[5] PCF and CIF are both located in the Pendleton Correctional Complex.

5

Just before her termination, Orton-Bell also learned that other employees and correctional officers at PCF were having sex on her desk. Orton-Bell complained to Internal Affairs employee Terry Silvers and Superintendent Alan Finnan about the sexual encounters. According to Orton-Bell, Silvers responded by saying, "I suggest you wash off your desk everyday." Additionally, according to Orton-Bell, Superintendent Finnan asked if offenders were involved. After she said "no," Superintendent Finnan replied, "Then we don't care."

Just days later, the State began investigating whether Orton-Bell was having an inappropriate relationship with the Major in Charge of Custody, Joseph Ditmer, and whether the couple had engaged in sexual relations on PCF premises. Internal Affairs interviewed both Orton-Bell and Ditmer about their relationship. Both Ditmer and Orton-Bell admitted to having sexual intercourse on PCF premises.[6]

Internal Affairs also reviewed email messages exchanged between Orton-Bell and Ditmer on their state-issued email accounts. The emails were often sexually explicit.

After the investigation, the State terminated both Orton-Bell's and Ditmer's employment. Orton-Bell did not appeal her termination. Ditmer, however, appealed his termination through State Personnel, which included a proceeding before the State Employee Appeals Commission. As a result of Ditmer's appeal and eventual settlement with the State, Ditmer's termination was converted to a resignation in good standing and he received additional employment related benefits.

Thereafter, both Orton-Bell and Ditmer applied for unemployment compensation benefits with the State Department of Workforce Development ("DWD"). Orton-Bell's and Ditmer's applications were not reviewed together. Rather, two separate DWD employees examined the

---

[6] According to Orton-Bell, Internal Affairs advised her that hugging and kissing were considered sexual intercourse.

applications. With regard to Ditmer, the DWD representative concluded that the State had not established just cause for his termination and he was entitled to receive full unemployment benefits. The DWD representative who reviewed Orton-Bell's application, however, determined that the State had established just cause for her termination. As a result, Orton-Bell's unemployment benefits were initially reduced by 25%.

## IV.   DISCUSSION

Orton-Bell alleges that her reduction in duties, her failure to obtain an award, and her termination were because of her gender in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and further, that her reduction in duties, her failure to obtain an award, and her termination were in retaliation for the complaints of sex discrimination she made to her superiors during her employment. Orton-Bell also alleges that she experienced a hostile work environment while employed at PCF.[7] The State maintains that Orton-Bell's employment was terminated after the State discovered that Orton-Bell and Ditmer were having sexual relations on PCF premises and that the pair used their state-issued email addresses to send sexually explicit messages to one another. The State further disputes Orton-Bell's retaliation and hostile work environment claims. Accordingly, the State now moves for summary judgment on each of Orton-Bell's claims.

### A.  Sex Discrimination

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . .

---

[7]Orton-Bell did not specifically include a hostile work environment claim in her Complaint against the State (dkt. no. 1). However, the Complaint includes allegations of a hostile work environment at PCF.  Additionally, both Orton-Bell and the State acknowledge Orton-Bell's hostile work environment allegations in their respective summary judgment filings. For these reasons, the Court will also address the hostile work environment allegations.

7

sex." 42 U.S.C. § 2000e-2(a)(1). To survive a motion for summary judgment on a Title VII disparate treatment claim, a plaintiff must present evidence of intentional discrimination through either the direct or indirect method. *See Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 611 (7th Cir. 2001). It is not entirely clear which method of proof Orton-Bell is using at this stage in the proceedings. As a result, the Court will analyze Orton-Bell's claim under both the direct and indirect methods of proof.[8]

*1. Direct Method*

"To avoid summary judgment under the direct approach, the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011). Direct evidence proves the decisionmaker's discriminatory intent without reliance on inference or presumption. *Id*. at 734. It amounts to an acknowledgement of discriminatory intent by the decisionmaker. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (explaining that employers are unlikely to be caught making statements that directly evidence discrimination, such as "I fired Judy because she was an old woman").

When evidence of such direct statements is not present, the Seventh Circuit has recognized "three distinguishable kinds of 'circumstantial' evidence of intentional discrimination" that a plaintiff may present to satisfy the direct method:

> The first consists of suspicious timing, ambiguous statements [sic] oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic

---

[8]The State attacks Orton-Bell's claims under both the direct and indirect methods. Orton-Bell, however, does not clarify which method she believes she can satisfy. Rather, Orton-Bell states that she "will respond to the Defendant's arguments on the factors argued by the Defendant." Pl.'s Resp. at 20.

> (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. Third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief.

*Rudin v. Lincoln Land Comm. Coll.,* 420 F.3d 712, 720-21 (7th Cir. 2005) (citations omitted). A plaintiff can thus survive summary judgment by "constructing a convincing mosaic of circumstantial evidence" that would permit a reasonable jury "to infer intentional discrimination by the decisionmaker." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

"Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Orton-Bell claims that she suffered three materially adverse employment actions: (1) she was threatened by the Superintendent, was not permitted to claim ownership of the outside dormitory therapeutic community, and was unable to claim an award for her contributions to the program; (2) her supervisory duties were reduced; and (3) the State terminated her employment. While Orton-Bell's termination qualifies as an adverse employment action under the law, the other alleged actions do not.

At a minimum, an employee "must be able to show a quantitative or qualitative change in the terms or conditions of employment." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). "[M]ere unhappiness and inconvenience are not actionable under Title VII." *Id.*; *see also Smart v. Ball State Univ.*, 89 F.3d 437, 441 (noting that "not everything that makes an employee unhappy is an actionable adverse action").

With regard to the threat by the Superintendent at PCF regarding the outside dormitory therapeutic community and her inability to obtain credit or an award for the idea, there was no quantitative or qualitative change in Orton-Bell's terms or conditions of employment. Additionally, Orton-Bell's duties, responsibilities, compensation, and benefits remained the same after the incident occurred. Although the threat and lack of credit or an award were unpleasant, as a matter of law, they do not constitute an adverse employment action.

Similarly, Orton-Bell's reduction in supervisory duties is not a materially adverse employment action. It is true that Orton-Bell supervised one or two staff members before Fleming arrived at PCF. After Fleming was hired to implement the outside dormitory therapeutic community, however, Orton-Bell's supervisory duties were passed on to Fleming because he was in a superior position to Orton-Bell. The evidence of record indicates that all other aspects of Orton-Bell's employment remained the same. Based on these facts, as a matter of law, the reduction in Orton-Bell's supervisory duties is not a materially adverse employment action.

With regard to Orton-Bell's termination, although it qualifies as an adverse employment action, Orton-Bell has presented no evidence indicating that she was terminated because of her gender. In other words, Orton-Bell has presented no direct evidence of discrimination, and she has not constructed a "convincing mosaic of circumstantial evidence" that raises the inference of intentional discrimination by the State. In this regard, the relevant evidence would not lead a reasonable jury to infer that Orton-Bell's termination occurred because of her gender. Accordingly, Orton-Bell's claim for sex discrimination fails under the direct method.

### 2.  *Indirect Method*

To avoid summary judgment under the indirect method, a plaintiff must offer evidence of a prima facie case that (1) she belongs to a protected class; (2) her performance met her

employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly situated employee not in her protected class received more favorable treatment. *Brummett v. Sinclair Broadcasting Grp. Inc.*, 414 F.3d 686, 692 (7th Cir. 2005) (describing the "*McDonnell Douglas*" framework). Once the plaintiff has established her prima facie case, the burden shifts to the employer to present a legitimate and non-discriminatory reason for the employment action. *Id.* On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id.* However, if a "plaintiff is unable to establish each element of this prima facie case, summary judgment must be entered in favor of the defendant." *Anders v. Waste Mgmt. of Wisconsin*, 463 F.3d 670, 676 (7th Cir. 2006).

There is no question that, as a woman, Orton-Bell satisfies the first element of the *McDonnell Douglas* framework. However, the Court need not and does not decide whether Orton-Bell can satisfy the second element, because her claim fails under the third and fourth elements of the indirect method.

Again, Orton-Bell claims that she suffered three separate adverse employment actions: (1) she was threatened by the Superintendent, was not permitted to claim ownership of the outside dormitory therapeutic community, and was unable to claim an award for her contributions to program; (2) her supervisory duties were reduced; and (3) the State terminated her employment. The Court has already determined, however, that only Orton-Bell's termination qualifies as an adverse employment action under the law.

Nevertheless, Orton-Bell fails to produce any evidence that she was treated less favorably than any similarly situated male employee. In fact, both Orton-Bell and Ditmer, a male counterpart, were terminated for their admitted behavior while on State property.

11

Orton-Bell argues that the treatment Ditmer received after his termination through the State Employee Appeals Commission and the DWD unemployment benefits process is evidence that a male employee was treated more favorably than she was by her employer. It is true that the "similarly situated inquiry is a flexible one," *Humpries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), however, these facts do not constitute evidence that a similarly situated employee was treated more favorably than Orton-Bell was treated in relation to her termination. In this regard, Ditmer received the additional benefits because he took proactive steps to appeal his termination. Orton-Bell did not. Accordingly, the fact that Ditmer appealed his termination and received additional employment benefits is unrelated to whether a male employee was treated more favorably than Orton-Bell was with regard to her termination.

Because Orton-Bell has not presented any evidence that she was treated less favorably than any similarly situated male employee in relation to her termination, Orton-Bell has failed to establish a prima facie case for discriminatory discharge and her claim under the indirect method fails. Accordingly, the State is entitled to summary judgment on Orton-Bell's discrimination claim.

### B. Retaliation

Title VII prohibits retaliation by an employer where "an employee 'has opposed any practice made an unlawful employment practice' or 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)). Like discrimination claims, plaintiffs may prove retaliation claims under either the direct or indirect method. *Id*. at 733. Again, it is not entirely clear which method of proof Orton-Bell is

using at this stage in the proceedings. As a result, the Court will analyze Orton-Bell's claim under both the direct and indirect methods of proof.

### 1. *Direct Method*

Under the direct approach, a plaintiff must present direct or circumstantial evidence of the following: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two." *Argyropoulos*, 539 F.3d at 733. Evidence of retaliation is considered to be "direct" when, "if believed, it would prove the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). "Because direct evidence 'essentially requires an admission by the employer,' such evidence 'is rare.'" *Argyropoulos*, 539 F.3d at 733 (quoting *Benders v. Bellows & Bellows*, 515 F.3d 757, 7646 (7th Cir. 2008)). When such an admission is not present, "[a] plaintiff can prevail under the direct method … by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Daugherty v. Wabash Ctr, Inc*., 577 F.3d 747, 751 (7th Cir. 2009) (quoting *Ridings v. Riverside Med. Ctr*., 537 F.3d 755, 771 (7th Cir. 2008)).

The Court need not and does not address whether Orton-Bell engaged in statutorily protected activities, because her claim for retaliation fails under the second and third elements.

Orton-Bell again alleges that the threat from the Superintendent, her inability to obtain an award, her reduction in duties, and her termination are materially adverse employment actions. However, as previously discussed, only Orton-Bell's termination qualifies as an adverse employment action under the law. Despite this fact, Orton-Bell has failed to establish the necessary causal link between the various complaints of discrimination she made throughout her

employment and her termination.[9] Rather, the evidence of record reveals that Orton-Bell's termination occurred immediately after the State discovered that Orton-Bell and Ditmer were engaging in sexual relations on PCF premises and using their state-issued email accounts to send sexually explicit messages.

Orton-Bell has presented no direct evidence of retaliation nor does the evidence reveal any.[10] Likewise, Orton-Bell has not, as a matter of law, constructed a "convincing mosaic of circumstantial evidence" that would raise an inference of intentional retaliation. Therefore, Orton-Bell's claim for retaliation under the direct method fails.

### 2. Indirect Method

A plaintiff "may establish a prima face case of retaliation under the indirect method by showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; (3) she met her employer's legitimate expectations, i.e., she was performing her job satisfactorily; and (4) she was treated less favorably than some similarly situated employee who did not engage in statutorily protected activity." *Argyropoulos*, 539 F.3d at 733. If these elements are established, "the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. … Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." *Haywood*, 323 F.3d at 531.

---

[9] To clarify, the Court is making no determination whether Orton-Bell engaged in statutorily protected activities in relation to her complaints and the related events.

[10] In fact, there is no evidence in the record that the alleged adverse employment actions are related to the complaints made by Orton-Bell during her employment or that they were carried out in retaliation for the complaints.

Again, the Court need not and does not address whether Orton-Bell engaged in statutorily protected activities or whether she met her employer's legitimate expectations, because her claim fails under the second and fourth elements of the indirect method.

As noted above, the reduction in Orton-Bell's supervisory duties, the threat from the Superintendent, and her inability to obtain credit or an award for the outside dormitory therapeutic community are not actionable adverse employment actions. Additionally, with regard to her termination, Orton-Bell has failed to establish or present any relevant evidence that she was treated less favorably than another similarly situated employee. Therefore, Orton-Bell's claim for retaliation under the indirect method also fails, and the State is entitled to summary judgment on Orton-Bell's claim for retaliation.

### C.  Hostile Work Environment

Lastly, Orton-Bell's hostile work environment claim "falls under the general rubric of harassment at the workplace, which can amount to prohibited discrimination in terms and conditions of employment." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). In order for Orton-Bell to survive summary judgment, she must show that:

> (1) [S]he was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability.

*Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). For sexual harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working atmosphere."

*McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

> Further, a claim for hostile work environment must be tested both objectively and subjectively. … That is, the plaintiff must subjectively believe that the harassment was sufficiently severe or pervasive to have altered the working environment, and the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment.

*Turner v. The Saloon, Ltd.*, 595 F.3d 679 (7th Cir. 2010) (internal citations omitted). A court must consider all of the circumstances in determining whether an environment is objectively hostile, "including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004).

In addition to the foregoing, a plaintiff must also demonstrate that her employer was negligent in allowing the harassment to occur. *Id*. "An employer can be held responsible for the conduct of coworkers in this context only if it 'knew or should have known' about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Id*. at 976 (quoting *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001)). The Seventh Circuit has further clarified that

> [i]f an employer takes reasonable steps to discover and rectify the harassment of its employees ... it has discharged its legal duty. An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made. We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed.

*Wyninger*, 361 F.3d at 976 (quoting *McKenzie*, 92 F.3d at 480).

In the present matter, Orton-Bell alleges that the following events and comments created a hostile work environment:

16

- Orton-Bell was called "Cinderella" and "Princess" by male employees at PCF.

- She received excessive pat-downs from female correctional officers.

- Male employees at PCF made comments about how the pat-downs were "almost like sex for them."

- Male employees at PCF engaged in sexual banter with Orton-Bell in person and via email.

- Orton-Bell was not permitted to wear jeans, but male employees were.

- On one occasion, Orton-Bell was required to remove her sweater in the shakedown area at PCF so that the sweater could be sent through a scanner. This caused Orton-Bell's spaghetti-strap camisole tank top to be exposed to male employees and offenders in the shakedown area.

- Other employees and correctional officers at PCF were having sex on Orton-Bell's desk.

- Ditmer had a history of coming onto and having sex with other PCF staff members.

- She was terminated for her sexual relationship with Ditmer.[11]

While these comments and events were inappropriate, as a matter of law, they are neither severe nor pervasive enough to violate Title VII. In this regard, several of these instances as alleged are unrelated to Orton-Bell's gender (e.g., other employees at PCF were having sex on Orton-Bell's desk). Additionally, the evidence of record makes it clear that Orton-Bell engaged in a consensual sexual relationship with Ditmer, and that she participated in and sometimes initiated the sexual banter with several male colleagues. *See Reed v. Shepard*, 939 F.2d 484 (7th

---

[11]Orton-Bell also alleges that the fact that her supervisory duties were reduced after Fleming, who was in a superior position to Orton-Bell, was transferred from CIF to PCF to lead the outside dormitory therapeutic community, and the fact that she was not given credit or a monetary award for her contributions to the outside dormitory therapeutic community are further evidence of a hostile work environment. As a matter of law, however, these events do not constitute sexual harassment.

Cir. 1991) (noting that where a plaintiff welcomes the "sexual hijinx of her coworkers," it is fatal to her claim); *Wyninger,* 361 F.3d at 97 ("Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive [nor] offensive enough to be actionable."). Furthermore, Orton-Bell has not presented any evidence suggesting that the foregoing instances interfered with her work.

Lastly, the State had a policy in place for addressing sexual harassment at PCF. Orton-Bell, however, did not file any formal notices with the State pursuant to the State's policy regarding sexual harassment complaining about the aforementioned issues. In other words, it appears that the State "took reasonable steps to discover and rectify the harassment of its employees," but Orton-Bell did not take advantage of the policy. *Wyninger*, 361 F.3d at 976. The State cannot be held liable for Orton-Bell's failure to use the policy established by the State.

Based on the foregoing, as a matter of law, the comments and events noted by Orton-Bell were neither severe nor pervasive enough to violate Title VII. Accordingly, the State is entitled to summary judgment on Orton-Bell's hostile work environment claim.

## V.  MOTION TO STRIKE

The State filed a motion to strike sections of the Plaintiff's Sur-reply on the grounds that the Sur-reply exceeded the limits of Local Rule 56-1(d). In light of the Court granting the State's Motion for Summary Judgment, the Court **DENIES AS MOOT** the Defendant's Motion to Strike Sections of the Plaintiff's Sur-Reply.

## VI. <u>CONCLUSION</u>

For the reasons set forth above, the Defendant's Motion for Summary Judgment is **GRANTED**. The Court further **DENIES AS MOOT** the Defendant's Motion to Strike Sections of the Plaintiff's Sur-reply.

SO ORDERED: 01/04/2013

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.